MAR − 4 2014

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

No. _____

Judge _____

Megan Antonich,

Plaintiff,

vs.

**FIRST AMENDED COMPLAINT**

U.S. Bank National Association d/b/a U.S.
Bank;

Defendant.

Plaintiff Megan Antonich, by and through her legal counsel, for her First Amended Complaint against Defendant U.S. Bank National Association d/b/a U.S. Bank, states and alleges as follows:

## PARTIES

1.     Plaintiff Megan Antonich ("Plaintiff") is a former bank teller employed by Defendant U.S. Bank National Association.  Plaintiff resides in Minneapolis, Minnesota.

2.     Defendant U.S. Bank National Association is a nationally chartered bank, with its main office and principal place of business located at 800 Nicollet Mall, Minneapolis, Minnesota 55402. U.S. Bank National Association does business under its own name and under the name "U.S. Bank."  U.S. Bank National Association (herein, "U.S. Bank") is a wholly owned subsidiary of U.S. Bancorp.

## JURISDICTION AND VENUE

3.     This action is brought to remedy U.S. Bank's illegal discrimination against Plaintiff on the basis of sex, specifically pregnancy, in violation of the Minnesota Human Rights

**EXHIBIT 1**

Act, Minn. Stat. §363A *et seq*. and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., as amended, including the Pregnancy Discrimination Act of 1978.

4.     This Court has jurisdiction over the parties and the causes of action alleged by Plaintiff because Plaintiff is a resident of Minnesota, U.S. Bank's principal place of business is in Minnesota, and the events alleged herein occurred in Minnesota.

5.     Venue in this Court is proper because U.S. Bank conducts business in Hennepin County, Plaintiff worked for U.S. Bank in Hennepin County, and Plaintiff's claims arose in Hennepin County.

6.     Plaintiff exhausted her applicable administrative remedies.

## FACTUAL ALLEGATIONS

7.     Plaintiff worked as a teller for U.S. Bank until she was terminated just one business day before her scheduled maternity leave. To justify its termination of Plaintiff, U.S. Bank identified a single error Plaintiff had made more than three months before her termination.

8.     Plaintiff started working full time for U.S. Bank as a teller in 2006 at its South Minneapolis branch in Minneapolis. U.S. Bank was soon thoroughly impressed with Plaintiff's Spanish-language skills and her ease with customers.

9.     After approximately a year, Plaintiff resigned her position to focus on another job and on her college studies. When she resigned, she left on good terms.

10.     In September 2010, Plaintiff returned to U.S. Bank as a full-time teller at the same South Minneapolis location.

11.     In August 2012, upon completion of her Associate of Arts degree, Plaintiff transferred to U.S. Bank's Robbinsdale branch to work as a part-time teller.

12.     On one of the last Saturdays of February 2013, Plaintiff was working at a drive-up window at U.S. Bank's Robbinsdale branch. Though it is U.S. Bank's policy that there always be at least one supervisor working at the Robbinsdale branch whenever the branch is open, there were no U.S. Bank supervisors working that day.

13.     At one of the busiest times of the day, Valentina Torres, another U.S. Bank teller, approached Plaintiff and requested that Plaintiff authorize the cashing of a $2,470 check for a customer. The check was issued from a U.S. Bank account.

14.     U.S. Bank establishes limits on the dollar amount of checks that each teller can cash. The $2,470 check was above Ms. Torres's check-cashing limit, but was within Plaintiff's $2,500 limit. When Ms. Torres received the $2,470 check, Plaintiff's $2,500 limit was the highest check-cashing limit of anyone working behind the teller line.

15.     With long waiting lines in the lobby of the branch and all three drive-up teller lanes backed up as well, Plaintiff quickly viewed the person bringing in the check, verified that the customer's identification appeared accurate, and ran the transaction.

16.     The next week, the branch's Banker Customer Service Manager, Matthew Schultz, informed Plaintiff that the $2,470 check had been fraudulent and a fraud hold had been placed on the business account from which the check was drawn.

17.     Plaintiff's supervisor, Teller Customer Service Manager Karissa Kujak, also informed Plaintiff that over the last few days approximately $10,000 of fraudulent checks had been cashed on the same business account.

18.     When discussing the issue, Kujak informed Plaintiff that she had failed to follow U.S. Bank's policy of obtaining a thumb print on all checks cashed for customers who do not hold a U.S. Bank account.

19.     Plaintiff recognized the error and apologized.

20.     Plaintiff had never made this mistake before. There was no formal meeting to discuss the issue and Plaintiff did not receive a verbal or written warning or any other form of discipline whatsoever.

21.     In March, Plaintiff met with Kujak for her annual performance review. Like every single past review, Plaintiff's annual review identified Plaintiff as a good performer who was valued as an employee by U.S. Bank. There was no mention on the written performance review of the $2,470 check Plaintiff had cashed, nor did Kujak and Plaintiff discuss the check during the performance review meeting.

22.     Around that time, U.S. Bank increased Plaintiff's hours from part time to full time. U.S. Bank also began occasionally asking Plaintiff to fill in at another branch. Plaintiff accepted and worked without issue at the other branch as well as at the Robbinsdale branch.

23.     Plaintiff was pregnant with an expected due date of June 10, 2013. Plaintiff intended to take maternity leave beginning on May 27, 2013.

24.     U.S. Bank policy requires that employees give at least thirty days' written notice of their need for maternity leave. Thus, Plaintiff notified both her then-supervisor, Teller Customer Service Manager Holly Kvapil, and Branch Manager Michael Christensen, of her expected leave via email in April. As required, Plaintiff sent this notification more than thirty days in advance of her expected leave. Plaintiff also gave advance notice to the Hartford, U.S. Bank's short-term disability benefits provider, as required by company policy.

25.     Plaintiff was almost always stationed in the drive-thru line, where she was expected to, and performed, efficient and accurate transactions for three lanes of traffic

4

simultaneously. Throughout the duration of her pregnancy, there were no chairs allowed for tellers.

26.     About one week prior to the beginning of her scheduled maternity leave, District Manager Matthew Thompson visited the branch as he frequently did. Although Plaintiff had not had any business meetings with him previously, Thompson made a point of stopping by to meet with Plaintiff as she was helping customers in the drive-thru. He then began talking about how annoyed he was that he did not get more time off when his wife had given birth to their children. He asked Plaintiff about her childcare situation, and he also wanted to know why she was starting her leave two weeks before her due date. Plaintiff told him the reason was because she was allowed to do so by company policy and Hartford policy. He then left Plaintiff's work station.

27.     On Thursday, May 23, 2013, when Plaintiff arrived to work, Kvapil instructed Plaintiff to meet with her and Christensen in Christensen's office. At the meeting, Christensen presented Plaintiff with an image of the $2,470 check from late February and asked Plaintiff if she remembered the transaction. She told him that the check had been cashed on a Saturday and that she had spoken with both Schultz and Kujak about the check shortly after it was cashed.

28.     Christensen claimed he was unaware that the issue had already been addressed with Plaintiff and stated that since Plaintiff's maternity leave was coming up in two days, some "closure" needed to be addressed. He then showed Plaintiff an email regarding the issue that had been sent to U.S. Bank Manager of Operations Mary Volker and told Plaintiff that her "job was on the line."

29.     Christensen went on to state that he was "going to fight" for Plaintiff to keep her job, because he himself had made a similar mistake that totaled around $10,000 in losses. Plaintiff then returned to her station in the drive-thru and worked until the end of her shift.

30.     On Friday, May 24—the day before Plaintiff's last scheduled day of work before her maternity leave was scheduled to begin—Plaintiff was again greeted by Kvapil and instructed to immediately come back with her to Christensen's office. In his office, Christensen stated, "I'm sorry, Megan. We're going to have to let you go. It is such bad timing, and I wish we could keep you on. It was not up to me though."

31.     Plaintiff handed over her bank keys and shook Christensen's hand. He thanked Plaintiff for her contributions to the Robbinsdale team and said, "Good luck with the baby!"

32.     Since her termination and the birth of her son, Plaintiff has applied for multiple positions within U.S. Bank. Though she has been qualified for the positions, U.S. Bank has failed to hire her.

33.     Plaintiff was pleased to find immediate interest in her qualifications by various hiring managers, and in several instances received calls to set up interviews the very same day she had applied for the positions.

34.     After having good interviews for various positions but receiving no job offers, Plaintiff contacted Erica Waldvogel, a representative from U.S. Bank Human Resources who was assigned to support U.S. Bank's Robbinsdale branch. Plaintiff discussed with Waldvogel her circumstances and inquired about her eligibility for re-hire at U.S. Bank. Waldvogel stated that Plaintiff was eligible for re-hire and she also informed Plaintiff that U.S. Bank had officially coded Plaintiff's termination as "unsatisfactory job performance." In spite of this code,

Waldvogel encouraged Plaintiff to apply for other U.S. Bank positions. Therefore, Plaintiff kept applying.

35.     Plaintiff applied for a position at the Midtown in-store branch of Minneapolis. Plaintiff had worked with that branch's Branch Manager previously at the branch; thus, the Branch Manager knew of Plaintiff's excellent work ethic and performance. Plaintiff's interview went well. Afterwards, the Branch Manager stated that she wanted to offer Plaintiff the position; however, the Branch Manager learned from her Human Resources Representative that she was not allowed to offer Plaintiff the job.

36.     After receiving this information, Plaintiff called Waldgoval and left a voice message. In her message, Plaintiff inquired about the mixed signals she had received regarding her re-hire status, informed Waldgoval that a branch manager wanted to hire her, and asked for guidance. Plaintiff never heard back, even after she left another message for Waldgoval.

37.     After two weeks, Plaintiff contacted Waldgoval's supervisor, Ann Steinke. Steinke, while apologetic, did not provide a plausible reason as to why Waldgoval was not responding to Plaintiff's inquiries.

38.     During their conversation, Steinke informed Plaintiff that a termination code of "unsatisfactory job performance" was inconsistent with the fraudulent check excuse Plaintiff was given by Branch Manager Christensen. She also informed Plaintiff that although she was eligible for re-hire, she would not be eligible to be hired in a branch office for at least a year. She encouraged Plaintiff to apply for a job at a competitor bank.

39.     Finally, Steinke recommended that Plaintiff file a complaint in line with the U.S. Bank Code of Ethics. Plaintiff filed her complaint on December 2, 2013, but was neither re-hired for her position nor hired for a new position within U.S. Bank.

## LEGAL CLAIMS

## COUNT I

## SEX DISCRIMINATION BASED ON PREGANCY
## IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

40. Plaintiff re-alleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

41. Plaintiff was an employee of U.S. Bank within the meaning of the Minnesota Human Rights Act, Minn. Stat. §363A *et seq.*

42. U.S. Bank terminated Plaintiff's employment and failed to re-hire Plaintiff because of her sex in violation of Minn. Stat. §363A.08, subd. 2.

43. U.S. Bank knew or should have known of the aforesaid conduct.

44. The unlawful employment practices set forth above were intentional.

45. As a result of the above, Plaintiff suffered damages, including loss of income, mental anguish or suffering, and other damages in an amount to be proven at trial, but believed to be in excess of $50,000.

46. Plaintiff is thus entitled to judgment against U.S. Bank in a reasonable amount in excess of $50,000—which should be trebled, civil fines, and her reasonable costs and attorney's fees pursuant to Minn. Stat. §§ 363A.29 and 363A.33.

## COUNT II

## SEX DISCRIMINATION BASED ON PREGANCY
## IN VIOLATION OF TITLE VII

47. Plaintiff re-alleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

48.     Plaintiff was an employee of U.S. Bank within the meaning of the Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*

49.     U.S. Bank terminated Plaintiff's employment and failed to re-hire Plaintiff because of her sex in violation of 42 U.S.C. §§ 2000e-2(a).

50.     U.S. Bank knew or should have known of the aforesaid conduct.

51.     The unlawful employment practices set forth above were intentional.

52.     As a result of the above, Plaintiff suffered damages, including loss of income, mental anguish or suffering, and other damages in an amount to be proven at trial, but believed to be in excess of $50,000.

53.     Plaintiff is thus entitled to judgment against U.S. Bank in a reasonable amount in excess of $50,000 and her reasonable costs and attorney's fees pursuant to Title VII.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff respectively prays that**

A.     The practices of U.S. Bank complained of herein be declared illegal as above alleged.

B.     Judgment be entered in favor of Plaintiff and against U.S. Bank, on Counts I and II and each of them in an amount in excess of $50,000 as determined by the Court and jury herein, together with prejudgment interest thereon.

C.     Plaintiff be awarded punitive damages pursuant to the Minnesota Human Right Act.

D.     Plaintiff be awarded punitive damages pursuant to Title VII.

E.     Plaintiff be awarded treble damages pursuant to the Minnesota Human Right Act.

F.      Plaintiff be awarded her legal expense, including reasonable attorneys' fees, experts' fees, and other costs and expenses incurred in this litigation.

G.      U.S. Bank pay a civil penalty to the State of Minnesota, under Minn. Stat. § 363A.29, subd. 4, for its violations of the Minnesota Human Rights Act.

H.      Plaintiff be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

## JURY DEMAND

Plaintiff demands trial by jury on all claims.

## ACKNOWLEDGEMENT

The undersigned acknowledges that pursuant to Minn. Stat. § 549.211, subd. 2, that costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find that the undersigned acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass, or committed a fraud upon the Court.

SCHAEFER HALLEEN, LLC

Dated: 3/3/14

Darren M. Sharp (#0387932)
Brian T. Rochel (#391497)
400 South Fourth Street, Suite 202
Minneapolis, Minnesota 55415
(612) 294-2600 Phone
(612) 294-2640 Fax

**ATTORNEYS FOR PLAINTIFF**