# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Megan Antonich,            Civil No. 14-CV-710 (SRN/HB)

       **Plaintiff,**             **MEMORANDUM**
                                           **OPINION AND ORDER**

v.

U.S. Bank National Association,

       **Defendant**.

_____

Brian T. Rochel, Teske, Micko, Katz, Kitzer & Rochel, PLLP, 222 South Ninth Street, Suite 4050, Minneapolis, Minnesota 55402, and Darren M. Sharp, Schaefer Halleen, LLC, 412 South Fourth Street, Suite 1050, Minneapolis, Minnesota 55415, for Plaintiff

Michael C. Wilhelm and David A. Schooler, Briggs & Morgan, PA, 80 South Eighth Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant
_____

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on Defendant's Motion for Summary Judgment

[Doc. No. 14]. In her First Amended Complaint [Doc. No. 1-1], Plaintiff Megan

Antonich asserts sex discrimination claims against Defendant U.S. Bank National

Association ("U.S. Bank"), arising under the Minnesota Human Rights Act ("MHRA"),

Minn. Stat. §§ 363A.01, et seq., and Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §§ 2000e-2.[1]  For the reasons set forth herein, Defendant's Motion is granted.

## I.     BACKGROUND

### A.     Employment and Corporate History

Antonich worked as a bank teller for U.S. Bank, working first at Defendant's South Minneapolis branch from the fall of 2006 through the fall of 2007, and from September 2010 through the summer of 2012.  (Antonich Dep. 30-32; 36; 38, Ex. 1 to Schooler Decl. [Doc. No. 17-1].)  In April 2011, Antonich took an eight-week parenting leave of absence, following the birth of her first child.  (Id. at 14-16.)  Antonich resigned in the summer of 2012 in order to complete an associate of arts degree.  (Id. at 39.)  In August 2012, U.S. Bank rehired Antonich as a teller at its Robbinsdale, Minnesota branch, where she worked approximately 30-35 hours per week.  (Id. at 41-42; 45.)

At the Robbinsdale Branch, Plaintiff's immediate managers were Customer Service Managers Karissa Kujak and Matthew Schultz.  (Waldvogel Decl. ¶ 2 [Doc. No. 21].)  Kujak and Schultz reported to Robbinsdale Branch Manager Michael Christensen, who reported to District Manager Matt Thompson.  (Id.)  Thompson reported to Regional Manager Christine Hobrough.  (Id.)

During the winter of 2012-2013, Plaintiff told Customer Service Manager Kujak

_____

[1]     Plaintiff filed her lawsuit in state court.  (First Am. Compl. [Doc. No. 1-1].) U.S. Bank, an Ohio corporation, removed the matter to this Court, asserting both diversity jurisdiction and federal question jurisdiction.  (Notice of Removal ¶¶ 4-6 [Doc. No. 1].)

that she was pregnant with her second child.  (Antonich Dep. 13-14, Ex. 1 to Schooler Decl. [Doc. No. 17-1].)  On April 26, 2013, Antonich submitted a request for an eight-week parenting leave to begin on May 27, 2013.  (Waldvogel Decl. ¶ 3 [Doc. No. 21].)  Defendant approved Plaintiff's request.  (Id. ¶ 4.)  However, Plaintiff's leave was not covered at the time by either the Minnesota Parenting Leave Act (MPLA) or the Family and Medical Leave Act (FMLA), because she had not worked at U.S. Bank for at least twelve consecutive months prior to the requested leave, nor had she performed at least 1,250 hours of work during the previous twelve months.  (Id.)  Antonich testified that in addition to Kujak, she also notified Branch Manager Christensen of her leave request.  (Antonich Dep. at 137, Ex. 1 to Schooler Decl. [Doc. No. 17-1].)

As a bank teller, Plaintiff worked with customers, processing deposits, withdrawals, and cashing checks.  (Waldvogel Decl. ¶ 5 [Doc. No. 21].)  To protect U.S. Bank against losses, the bank maintains certain check-cashing policies and procedures.  (Id.)  Two of U.S. Bank's policies related to check cashing are a thumb print signature policy and a teller override policy.  (Id.)  The thumb print signature policy requires non-customers – i.e., persons who are not deposit account holders – to provide a thumb print on the face of a check they wish to cash.  (Thumb Print Signature Policy, Ex. 1 to Waldvogel Decl. [Doc. No. 21-1].)  Through the teller override policy, a message is displayed on the teller's computer screen, alerting the teller of the need for extra caution in processing a particular transaction.  (Operating Procedures Manual, Ex. 2 to Waldvogel Decl. [Doc. No. 21-1].)  For instance, if a check number is out of sequence on a

customer's account, the check is for a large amount, or if the account has been open for 90 days or less, an override alert will appear. (Id.) As to out-of-sequence checks, the policy states that a check may be out of sequence because "someone has stolen a check from the back of a pad of checks or a pad of checks from the bottom of the box." (Id.)

Defendant provided training to Plaintiff on these policies when she was first hired in 2006 and again in 2010. (Antonich Dep. 75-76; 83-84, Ex. 1 to Schooler Decl. [Doc. No. 17-1].) Antonich testified to her understanding of these policies and that they applied to her position as a bank teller. (Id. at 107-09.) She also understood that mistakes made on the job could jeopardize her employment. (Id. at 91.) When Plaintiff started working at the Robbinsdale branch in August 2012, she received and signed a copy of the bank's loss management policy, which indicates that the corrective action for a bank teller's cash difference of $1,000 or more is "Action Plan or Termination." (U.S. Bank's Guidelines for Managing Losses, Ex. 4 to Waldvogel Decl. [Doc. No. 21-1].) Moreover, as to losses incurred due to the failure to follow operating procedures, U.S. Bank takes into account both the dollar amount of the loss and the number of times the employee fails to follow procedures. (Id.) For example, where a loss is $500-999, and an employee has failed to follow procedures two times, "Verbal Counseling with Documentation or Action Plan" is prescribed; for a loss of $1,000 or more, where an employee has failed to follow procedures three times, an "Action Plan, Warning, or Termination" is indicated. (Id.) Antonich testified that she understood that termination was a possible outcome for a loss of $1,000 or more. (Antonich Dep. 104-05, Ex. 1 to Schooler Decl. [Doc. No. 17-1].)

The general practice at U.S. Bank is to terminate employees who cause a loss in excess of $1,000. (Zetzman Decl. ¶ 4 [Doc. No. 19].)

**B.    Plaintiff's Policy Violations and Termination**

While working on February 23, 2013, Antonich processed the cashing of a $2,470 fraudulent check, causing U.S. Bank to incur a loss in that amount. (Antonich Dep. at 58, Ex. 1 to Schooler Decl. [Doc. No. 17-1].) The fraudulent check was one of approximately $10,000 in fraudulent checks that had been cashed on the same U.S. Bank account over that weekend. (Id. at 121-22.) In Plaintiff's deposition, she admitted that in the course of cashing the check, she failed to follow U.S. Bank's policies. (Id. at 124.) Specifically, Antonich conceded that she did not obtain a thumb print from the person cashing the check, although she knew that it was required of non-U.S. Bank customers. (Id. at 60.) She testified that had she followed the policy, the loss could have potentially been avoided. (Id. at 67.) Antonich could not recall if a check override message appeared when she processed the fraudulent check. (Id. at 74.)

Three days later, Customer Service Manager Schultz informed Plaintiff that a fraud hold had been placed on the check that was cashed on February 23. (Id. at 114.) Plaintiff apologized and explained the transaction to Schultz. (Id. at 115-16.) A few days later, Plaintiff spoke to her immediate manager, Kujak, who had been on vacation when Plaintiff cashed the fraudulent check. (Id. at 121-23.) Kujak informed Plaintiff that U.S. Bank was conducting an investigation into the matter. (Id. at 121-23.) Antonich testified that she spoke to Kujak in order to "gain closure" about the event, but stated that she did

not, in fact, gain closure on that date.  (Id. at 122.)  Plaintiff testified that she understood that cashing the check was a "serious situation," for which she expected some type of disciplinary action for failing to adhere to the bank's procedures.  (Id. at 123-24.)  She knew that she might possibly lose her job because of the fraudulent check.  (Id. at 126.)  However, at Plaintiff's next performance review, conducted with Kujak in March 2013, Kujak did not discuss the fraudulent check.  (Id. at 138-39.)  Plaintiff received a positive review.  (Id. at 139.)

As noted earlier, on April 26, 2013, Antonich submitted a request for parenting leave to begin approximately one month later, which the bank approved.  (Waldvogel Decl. ¶ 3 [Doc. No. 21].)   In approximately mid-May 2013, District Manager Thompson spoke with Antonich about her parenting leave while Antonich was stationed at the bank's drive-thru, assisting customers.  (Antonich Dep. at 140-41, Ex. to Sharp Decl. [Doc. No. 25-1].)  Plaintiff indicated that Thompson asked her questions relating to when and why she was taking her parenting leave and about her childcare situation.  (Id. at 140-41.)   During the conversation, Thompson stated that he was "annoyed that he didn't get more time off when his wife [a U.S. Bank employee] had their children . . . ."  (Id. at 140.)   Antonich considered Thompson's inquiries and comments unprofessional and disrespectful and felt that he was prying into her personal life.  (Id. at 142-43.)  She believed that the conversation had a "hue of discrimination" about it (id. at 144), testifying that on previous occasions, she had heard branch managers at other branches grumble about short staffing when female employees were on parenting leave.  (Id. at

6

148-49.)

In May 2013, U.S. Bank's District Performance Analyst, Marie Adkins, learned of the February 23, 2013 fraudulent check transaction involving Antonich. (Adkins Decl. ¶ 2 [Doc. No. 18].) As part of Adkins' duties, she was required to review losses posted on the U.S. Bank loss database on a monthly basis and determine whether the losses resulted from procedural violations, requiring further disciplinary actions. (Id. at ¶ 3.) Adkins typically reviews branch losses approximately one month after the losses are posted. (Id.) The loss caused by the fraudulent check in question was posted to the U.S. Bank database on April 4, 2013. (Id. at ¶ 4.) When Adkins reviewed the loss in May, she determined that Plaintiff had violated two U.S. Bank policies when she processed the fraudulent check – she failed to obtain a thumb print and overrode an out-of-range-check message. (Id.)

Adkins reported the two policy violations to the following persons in management: Robbinsdale Branch Manager Christensen, District Manager Thompson, Regional Manager Hobrough, and U.S. Bank Human Resources ("HR") Business Partner Kara Zetzman. (Zetzman Decl. ¶ 2 [Doc. No. 19].) Zetzman attests that she spoke with Plaintiff by telephone about the policy violations, and during the call, Plaintiff admitted that she did not follow U.S. Bank policies while cashing the check. (Id. at ¶ 3.) Plaintiff, however, contends that she had no conversations with U.S. Bank management during this time period regarding the check-cashing incident. (Antonich Dep. at 129, Ex. to Sharp Decl. [Doc. No. 25-1].)

Antonich testified that on May 23, 2013, Christensen showed her an image of the fraudulent check and informed her that she might be disciplined for the policy violations. (Antonich Dep. at 130-31, Ex. to Sharp Decl. [Doc. No. 25-1].)  Christensen also told Antonich that her job was on the line, and that "closure" was needed before her parenting leave, which was scheduled to begin on May 27, 2013.  (Id. at 52, 130-31.)   Plaintiff also testified that Christensen told her that he would "fight for [Plaintiff] to keep her job because he himself had made a similar mistake which totaled a much higher dollar amount and he still work[ed] for the bank." (Id.)

Based on Plaintiff's purported admissions to HR Business Partner Zetzman, and the amount of loss, Zetzman recommended Plaintiff's termination.  (Zetzman Decl. ¶ 3 [Doc. No. 19].)  District Manager Thompson spoke with Regional Manager Hobrough and also recommended Plaintiff's termination.  (Thompson Dep. 26; 36, Ex. to Sharp Decl. [Doc. No. 25-1].)  During their conversation, Thompson informed Hobrough that Antonich was planning to go on leave.  (Id. at 36-37.)  He testified that while Plaintiff's pregnancy was not relevant to the issue of Plaintiff's discipline, he wanted Hobrough to be aware of all of the facts.  (Id. at 37.)   Hobrough similarly testified that during her conversation with Thompson, Thompson indicated that Antonich was pregnant and about to take a leave of absence – facts which Hobrough considered irrelevant to the corrective action decision.  (Hobrough Dep. at 78; 80, Ex. to Sharp Decl. [Doc. No. 25-1].) Hobrough could not recall whether Thompson indicated when Plaintiff's leave was scheduled to occur.  (Id.)  Thompson also indicated that the investigation concerning the

loss took longer than usual.  (Id. at 82; 101.)

Hobrough ultimately made the decision to terminate Plaintiff's employment (Hobrough Decl. ¶ 3 [Doc. No. 20]) – a decision that she made as soon as the situation was presented to her.  (Hobrough Dep. at 81, Ex. to Sharp Decl. [Doc. No. 25-1].)  On May 24, 2013, Christensen informed Plaintiff of her termination.  (Antonich Dep. at 53-54, 132, Ex. 1 to Schooler Decl. [Doc. No. 17-1].)  Christensen told Antonich that the termination decision was made to ensure "region-wide consistency," but felt that it was "bad timing," and "if it were up to [him, he] would have kept [Plaintiff] on." (Id.)

## C.     Post-Termination and Plaintiff's Ethics Complaint

Plaintiff gave birth to her baby on May 27, 2013. (Antonich Dep. at 179, Ex. to Sharp Decl. [Doc. No. 25-1].)  Four or five weeks after the child's birth, Plaintiff contacted U.S. Bank, inquiring whether she was eligible for re-hire.  (Id.)  She was informed that she was eligible for re-hire, but that she might not be eligible to work at U.S. Bank as a teller.  (Id.)  Plaintiff then applied for several positions at U.S. Bank. (Antonich Dep. at 174, Ex. 1 to Schooler Decl. [Doc. No. 17].)  When she did not receive any offers, Antonich contacted U.S. Bank and was told that her failure to secure re-employment was due to a "human resources-related issue."

Antonich later contacted Human Resources Manager Ann Steinke to inquire about the human resources-related issue.  (Id. at 174-75.)  Steinke told Plaintiff that she would not be eligible for a teller position at U.S. Bank for about a year and encouraged Plaintiff to apply to competitor banks.  (Id.)  Erica Waldvogel, a U.S. Bank HR Business Partner,

attests that U.S. Bank typically does not re-hire former employees for money-handling positions, such as teller positions, if they caused financial losses by violating company policy in their previous employment with U.S. Bank. (Waldvogel Decl. ¶ 13 [Doc. No. 21].) Moreover, a previous policy violation resulting in a monetary loss makes it more difficult for an applicant to be re-hired for any U.S. Bank position. (Id.)

On December 3, 2013, Plaintiff filed an ethics complaint on U.S. Bank's website claiming that she was terminated two days prior to her parenting leave so that she would become ineligible for FMLA benefits. (Ethics & Compliance Hotline Form, Ex. 4 to Waldvogel Decl. [Doc. No. 21-1]; see also Antonich Dep. at 176, Ex. 1 to Schooler Decl. [Doc. No. 17-1].) In her ethics complaint, Plaintiff stated that after making the one-time mistake with the fraudulent check, U.S. Bank allowed her to work a full-time schedule, i.e., 10-15 hours more than her regular 20-hours per week. (Ethics & Compliance Hotline Form, Ex. 4 to Waldvogel Decl. [Doc. No. 21-1].)

Waldvogel investigated Plaintiff's complaint by contacting Plaintiff's managers and reviewing Plaintiff's time cards, the fraudulent check, and Plaintiff's personnel file. (Ethics Issue Response Form, Ex. 6 to Waldvogel Decl. [Doc. No. 21-1].) Waldvogel summarized her findings in an "Ethics Issue Response Form," stating:

> The loss the branch took from Megan failing to follow procedure hit the branch in April. Otherwise they were unaware that the loss might occur. Once Marie Adkins learned of the loss[,] the branch went through the investigation and conversations with Megan about what she did and how it should have been handled. HR was involved[,] and due to the timing of the leave[,] this was escalated to a HR Manager, delaying the time to make the decision. The employee continued to work the additional hours that she

requested at an earlier date since the branch still had hours available for her to work. Management worked around Megan's school schedule and what she wanted to work. She never requested to work less hours or to go back to just her scheduled 20.

(Id.) Regarding the statement in the Ethics Issue Response Form that the timing of Antonich's impending leave led to the involvement of an HR Manager, which, in turn, delayed the time to make the decision, both Hobrough and Thompson denied that Plaintiff's pregnancy or parenting leave had any impact on the timing of the termination decision. (Hobrough Dep. 80-81, Ex. to Sharp Decl. [Doc. No. 25-1]; Thompson Dep. at 97-100, Ex. to Sharp Decl. [Doc. No. 25-1].)

## II. DISCUSSION

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank of Missouri, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  Id. at 323; Enter. Bank, 92 F.3d at 747.  A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

U.S. Bank moves for summary judgment, arguing that no genuine issues of material fact are in dispute.  Specifically, Defendant asserts that it provided a lawful reason for terminating Plaintiff and for deciding against rehiring her.  In addition, Defendant contends that there is no evidence showing that it treated Plaintiff differently than any other similarly situated employee on the basis of pregnancy.  Further, U.S. Bank maintains that there is no evidence showing that the stated reason for Plaintiff's termination was a pretext for unlawful discrimination.

Plaintiff argues that a jury could find that U.S. Bank's articulated reason for terminating Plaintiff was mere pretext for discrimination, noting that it occurred just two days before her scheduled parenting leave.  Plaintiff also argues that because the stated reason for her termination – the policy violations resulting in a loss of $2,470 – occurred three months earlier than her termination date, this interval of time suggests that the fraudulent check incident was not the true reason for her termination.  Plaintiff also makes several additional arguments in support of the existence of pretext.  Among her arguments, she identifies certain comments of Defendant's employees and also contends that Defendant treated her differently than similarly situated, non-pregnant employees.

## B.    Sex Discrimination

Plaintiff asserts claims of sex discrimination under the MHRA, Minn. Stat. § 363A *et. seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  The MHRA and Title VII, as amended by the Pregnancy Discrimination Act ("PDA"), prohibit sex discrimination on the basis of sex, which includes pregnancy and childbirth.   Minn. Stat. § 363A.03, subd. 42, 363A.08, subd. 2; 42 U.S.C. § 2000e(k).   Sex discrimination claims under Title VII and the MHRA are analyzed under the same framework, Fjelsta v. Zogg Dermatology, PLC, 488 F.3d 804, 809 (8th Cir. 2007) (citations omitted), and may be analyzed simultaneously, Roberts v. Park Nicollet Health Servs., 528 F.3d 1123, 1127 (8th Cir. 2008) (citing Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998)). The Court therefore relies on decisions under Title VII in analyzing Plaintiff's MHRA claim.  See Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 795-96 (8th Cir. 1996) (noting that courts may look to federal cases interpreting analogous federal anti-discrimination statutes for guidance in cases arising under state anti-discrimination statutes) (citation omitted).

A plaintiff may establish an unlawful employment practice by demonstrating that sex, including pregnancy, was a "motivating factor" for discharge, even though other factors also motivated discharge.  42 U.S.C. § 2000e-2(m).  A plaintiff asserting a claim of sex discrimination must present direct evidence of discrimination or provide indirect evidence from which discrimination may be inferred.  Elam v. Regions Fin. Corp., 601 F.3d 873, 879 (8th Cir. 2010) (citations omitted) (addressing claims brought under the

PDA, Title VII, and an analogous Iowa civil rights statute).

### 1. Direct Evidence

Direct evidence of discrimination clearly shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 860 (8th Cir. 2009) (quoting Russell v. City of Kansas City, 414 F.3d 863, 866 (8th Cir. 2005)). The "direct" aspect of such evidence "refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir. 2011). To be considered direct evidence, such evidence must consist of "conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr., 133 F.3d 616, 619 (8th Cir. 1998).

Defendant contends that there is no direct evidence of discrimination here. (Def.'s Mem. in Supp. Mot. for Summ. J. at 15 [Doc. No. 16].) Although Plaintiff argues that she possesses direct evidence of discrimination, in her opposition memorandum, she does not specify any direct evidence, but instead presents only indirect evidence. (Pl.'s Opp'n Mem. at 11, n.2 [Doc. No. 24]) (stating, "Ms. Antonich can proceed under the direct method and has direct evidence of discrimination, but omits those arguments here because

14

she can succeed using the <u>McDonnell Douglas</u> framework."). "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument." <u>Satcher v. Univ. of Ark. at Pine Bluff Bd. of Tr.</u>, 558 F.3d 731, 735 (8th Cir. 2009). Since Plaintiff fully describes the indirect evidence of discrimination on which she relies, the Court will not speculate about what her direct evidence might be. The Court finds that Antonich has waived any argument with respect to direct evidence and therefore proceeds to analyze her indirect evidence.

### 2.    Indirect Evidence

When a plaintiff lacks direct evidence of discrimination, as is the case here, courts follow the familiar burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802–03 (1973), to analyze indirect evidence of discrimination. <u>See Wierman v. Casey's General Stores</u>, 638 F.3d 984, 993 (8th Cir. 2011). Under the <u>McDonnell Douglas</u> framework, the plaintiff initially must establish a prima face case of discrimination, demonstrating that: (1) she is a member of a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) she was discharged under circumstances giving rise to an inference of unlawful gender discrimination. <u>Id.</u> (citing <u>Elam</u>, 601 F.3d at 879). The burden of production then shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. <u>Id.</u> If the defendant meets that minimal burden, the burden shifts back to the plaintiff to rebut the defendant's proffered reason with sufficient "admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive," even if the plaintiff's

evidence does not directly disprove the defendant's proffered explanation.   Id. at 995. (citations omitted).  The burden of establishing pretext is more onerous than the burden of establishing a plaintiff's prima facie case and requires more substantial evidence "because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification."  Sprenger v. Fed'l Home Loan Bank of Des Moines, 253 F.3d 1106, 1111 (8th Cir. 2001).

Assuming, without deciding, that Antonich has established a prima facie case of gender discrimination, U.S. Bank has offered a legitimate, non-discriminatory reason for terminating Antonich – her violation of two check cashing policies, which resulted in a loss of $2,470.  (Hobrough Decl. ¶ 3 [Doc. No. 20].)  U.S. Bank's Guidelines for Managing Losses set forth the applicable policies and procedures and indicate the potential consequences for failing to follow them.  (U.S. Bank's Guidelines for Managing Losses, Ex. 4 to Waldvogel Decl. [Doc. No. 21-1].)  In determining the appropriate corrective action for employees who violate policy, resulting in monetary loss, U.S. Bank considers both the dollar amount of the loss and the number of policy violations.  (Id.) U.S. Bank's general practice is to terminate employees who violate a company policy and cause a loss in excess of $1,000.  (Zetzman Decl. ¶ 4 [Doc. No. 19].)  Plaintiff knew that she violated U.S. Bank's policies in processing the fraudulent check.  (Antonich Dep. at 124, Ex. 1 to Schooler Decl. [Doc. No. 17-1].)  Further, she knew that termination was a possible form of corrective action.  (Id. at 104-05.)

In addition, U.S. Bank has articulated a legitimate, non-discriminatory reason for

not re-hiring Plaintiff.  U.S. Bank attests that it typically does not re-hire former employees for money-handling positions, such as teller positions, if they caused financial losses by violating company policy in their previous employment with U.S. Bank. (Waldvogel Decl. ¶ 13 [Doc. No. 21].)   Moreover, a previous policy violation resulting in a monetary loss makes it more difficult for an applicant to be re-hired for any U.S. Bank position.  (Id.)

As Defendant has met its minimal burden of establishing a legitimate, non-discriminatory basis for Plaintiff's termination and subsequent decision not to re-hire, the burden shifts back to Antonich to raise genuine doubt as to whether Defendant's justification was pretextual.   Again, the burden of establishing pretext requires more substantial evidence than required to establish a prima facie case, as evidence of pretext and discrimination are viewed with reference to the employer's legitimate, non-discriminatory justification for the adverse employment action.  Sprenger, 253 F.3d at 1111.  A plaintiff may demonstrate pretext by: (1) rebutting the factual basis underlying the explanation, demonstrating that it is "unworthy of credence"; or (2) showing that the employer's proffered explanation was not the true reason for the adverse employment action, but that an impermissible motive likely motivated the employer's action.  Fiero v. CSG Sys., Inc., 759 F.3d 874, 878 (8th Cir. 2014) (citing Fitzgerald v. Action, Inc., 521 F.3d 867, 873 (8th Cir. 2008)).  To survive summary judgment, Plaintiff must identify evidence creating a fact issue as to whether U.S. Bank's proffered justification was not simply pretextual, but was "a pretext for discrimination,"  Hutson v. McDonnell Douglas

Corp., 63 F.3d 771, 777 (8th Cir. 1995) (emphasis in original).

Plaintiff points to the following to meet her burden of demonstrating a fact question as to pretext: (1) temporal proximity between Plaintiff's parenting leave and her termination; (2) Defendant's changed conduct toward Plaintiff after she applied for parenting leave; (3) certain comments and statements made by Defendant's employees; (4) conflicting evidence regarding participants in the termination decision; (5) Defendant's preferential treatment of similarly situated, non-pregnant employees; (6) Defendant's failure to follow its own practices and procedures; and (7) Defendant's lack of documentation regarding the termination decision.

### a.    Temporal Proximity

Plaintiff argues that the timing of her termination – occurring just two days prior to her scheduled parenting leave and resulting from policy violations and financial loss that occurred three months earlier – demonstrates discriminatory intent and pretext.  (Pl.'s Opp'n Mem. at 13-15 [Doc. No. 24].)  She argues that only after she requested parenting leave and officially notified U.S. Bank of her pregnancy on April 26, 2013 did U.S. Bank begin any investigation into her role with the fraudulent check or take any corrective action.  (Id. at 14.)  Antonich identifies the following timing-related facts as probative of pretext: (1) Defendant's knowledge of her pregnancy and impending leave in relation to her termination date; and (2) the length of time Defendant took to investigate her actions regarding the fraudulent check.

In general, something more than temporal proximity between an employee's

18

protected conduct and an employer's adverse action is required in order to present a genuine disputed issue of fact as to pretext for unlawful discrimination. Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1020 (8th Cir. 2005). Only on "rare occasions" may "close temporal proximity between an employer's discovery of a protected characteristic and an adverse employment action . . . suffice to create an inference of discrimination." Id.

The Court finds that the temporal evidence in this case does not present the rare occasion from which discrimination may be inferred. First, as to Defendant's awareness of her pregnancy, Plaintiff informed Customer Service Manager Kujak of her pregnancy in the winter of 2012-13. (Antonich Dep. at 13, Ex. 1 to Schooler Decl. [Doc. No. 17-1].) After Kujak left her position, and her successor, Holly Kvapil, started in April or May 2013, Plaintiff also told Kvapil that she was pregnant. (Kvapil Dep. at 12, Ex. 3 to Supp'l Schooler Decl. [Doc. No. 28-1].)[2] Given that Plaintiff's immediate supervisor was aware

_____

[2] In support of Defendant's Reply Memorandum [Doc. No. 27], U.S. Bank submitted the Supplemental Declaration of David Schooler [Doc. No. 28], accompanying exhibits, and the Supplemental Declaration of Marie Adkins [Doc. No. 29]. The Local Rules preclude Defendant from raising new issues and submitting affidavits and exhibits in connection with a reply memorandum of law. Cenveo v. S. Graphic Sys., Inc., No. 08-CV-5521 (JRT/AJB), 2010 WL 3893680, at *3, n.4 (D. Minn. June 18, 2010). Rule 7.1(c)(3)(B) contemplates that the factual basis for a dispositive motion will be established with affidavits and exhibits served and filed in connection with the initial motion and the responding party's memorandum of law. "Although the rule makes provision for a Reply Memorandum, it neither permits nor prohibits the moving party from filing affidavits or other factual material therewith." 1999 Adv. Cmte. Note to L.R. 7.1(b)(2). Reply affidavits are only appropriate when necessary to address factual claims of the responding party that were not reasonably anticipated. Here, the Court finds that the reply declarations and accompanying exhibits do not raise new facts or arguments, but simply address Plaintiff's factual claims. Furthermore, some of the supplemental exhibits

of her pregnancy approximately three-four months prior to her anticipated parenting leave, temporal proximity is lacking.  In Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002), the Eighth Circuit found that a two-week interval between an employee's leave and her termination could establish the causation element of the plaintiff's prima facie discrimination case, because only a minimal showing is required before requiring an employer to explain its actions.  However, while temporal proximity sufficed for purposes of the prima facie case, the court found that the same evidence did not establish that the defendant's proffered reason was pretextual, particularly since "evidence of pretext and discrimination is viewed in light of the employer's justification." Id.  Taking into account all of the evidence, including the nature and magnitude of the employee's dereliction, the fact that Smith was fired at about the same time that she took family leave did not support an inference of pretext.  Id.

In addition, the Eighth Circuit has noted that "[e]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." Id. (citing Smith v. Ashland, Inc., 250 F.3d 1167, 1174 (8th Cir. 2001)).  There is no dispute that U.S. Bank was aware of the February 23, 2013 fraudulent transaction prior to Plaintiff's April 26, 2013 application for parenting leave.  During the first week of March 2013, Plaintiff understood that U.S.

_____

duplicate exhibits previously submitted as exhibits to Defendant's initial memorandum (i.e., the Antonich Deposition) or to Plaintiff's opposition memorandum (i.e., the Thompson Deposition), and are therefore already before the Court in the initial brief and Plaintiff's response.  In any event, the Court's consideration of these declarations and exhibits does not change its analysis of the summary judgment motion.

Bank was investigating the incident involving the fraudulent check. (Antonich Dep. at 123, Ex. 1 to Schooler Decl. [Doc. No. 17-1].) Antonich knew that violating the bank's policies, combined with the amount of loss, was a "serious situation," for which she expected to receive some type of disciplinary action. (Id. at 123-24.) When she informed her immediate supervisor, Kujak, of the incident in early March, Antonich testified that she herself was not able to obtain closure at that time. (Antonich Dep. at 122, Ex. 1 to Schooler Decl. [Doc. No. 17-1].)

Defendant has fully explained the timing of its investigation of Plaintiff's admitted policy violations in cashing the fraudulent check. While Plaintiff contends that "nothing changed in terms of U.S. Bank's knowledge of the events or its own policies between February 23, when the incident occurred, and May 24, when Ms. Antonich was fired," (Pl.'s Opp'n Mem. at 14 [Doc. No. 24]), the facts, however, reveal that many things changed.

First, the loss resulting from the fraudulent check did not post to U.S. Bank's loss database until April 4, 2013. (Adkins Decl. ¶ 3 [Doc. No. 18].) Adkins explained that several factors can affect when a fraudulent transaction is confirmed as a loss and posted to the database, including when the customer reports it and the amount of time taken by U.S. Bank's fraud department to process a fraudulent transaction. (Adkins Dep. at 24-25, Ex. 4 to Supp'l Schooler Decl. [Doc. No. 28-1].) Second, Adkins did not see the posted fraudulent check until May 2013, consistent with her practice of reviewing losses from bank branches during the month after they are posted to the database. (Id.; Adkins Decl.

¶¶ 3-4 [Doc. No. 18].)  After Adkins determined that Antonich had violated bank procedures, resulting in a loss, she next notified District Manager Thompson.  (Adkins Decl. ¶ 5 [Doc. No. 18].)  Plaintiff was terminated shortly thereafter.  Adkins testified to having followed her standard procedures in reviewing the loss in question.  (Adkins Dep. at 29; 42, Ex. 4 to Supp'l Schooler Decl. [Doc. No 28-1]; see also Adkins Decl. ¶¶ 2-4 [Doc. No. 18].)

To contradict Adkins' testimony, Plaintiff cites her own deposition testimony in which she stated that Regional Operations Manager Mary Volker, Adkins' superior, was aware of the fraudulent check and was investigating it in the first week of March.  (Antonich Dep. at 122-23, Ex. to Sharp Decl. [Doc. No. 25-1].)  Specifically, Plaintiff testified to her memory of a conversation with her immediate supervisor, Kujak, in which Kujak indicated that she had communicated with Volker regarding a fraud ring possibly responsible for processing fraudulent checks "and that they were looking into what else had happened. . . ."  (Id. at 122.)  But Plaintiff's testimony, containing hearsay as to Volker's investigation, merely indicates that Volker may have been working with law enforcement authorities to externally investigate a fraud ring, which was Plaintiff's understanding as well.  (Id. at 123.)  Regardless of Volker's knowledge of the fraudulent check and whether her investigation was external or internal, Adkins followed her standard procedure for reviewing losses posted to U.S. Bank's loss database.

While Plaintiff apparently contends that three months is too long for U.S. Bank to legitimately conduct an investigation into cash losses, Defendant's responses to Plaintiff's

interrogatories demonstrate otherwise. Defendant has identified at least one teller whose $1,500 loss, based on a "teller variation," led to his termination nearly three months later, as well as another teller who caused a loss, also based on a teller variation, that was not discovered until approximately 2.5 years after her resignation. (See Def.'s Am. Interrog. Answers to Interrog. No. 6, Ex. 23 to Sharp Decl. [Doc. No. 25-2].) District Manager Thompson acknowledged to Regional Manager Hobrough, when discussing corrective action for Plaintiff, that the investigation took longer than usual. (Hobrough Dep. at 101, Ex. to Sharp Decl. [Doc. No. 25-1].) While a three-month investigatory period was longer than usual, it does not follow that the resulting termination for policy violations resulting in a loss greater than $1,000 was either unusual or discriminatory. In fact, Defendant has identified other employees who were terminated for causing less substantial losses, including a $1,998.99 loss for a policy violation, and $2,000 and $1,500 losses for which the description is merely "loss," without regard to policy violation, teller variation, or cash shortage. (Id.)

In sum, the facts presented by Plaintiff in support of temporal proximity fail to establish an issue of fact as to pretext.

### b. Changed Conduct

Plaintiff identifies a "change in conduct" by U.S. Bank employees as evidence of pretext. (Pl.'s Opp'n Mem. at 15-16; 17-20 [Doc. No. 24].) As to the change in conduct, Plaintiff contends that after she applied for parenting leave, Defendant changed its conduct towards her. She contends that even though the check-cashing incident was

known to her immediate supervisors shortly after the fraudulent check was processed, it was not until close to her parenting leave that Defendant discussed the loss. (Pl.'s Opp'n Mem. at 15 [Doc. No. 24].) In the interim, as noted above, Plaintiff received a positive performance review shortly before she was terminated, but weeks after she processed the fraudulent check. All of this, Antonich asserts, demonstrates pretext. (Id. at 15-16.)

Where an employer tolerates an employee's undesirable conduct or behavior for an extended period of time, and then takes adverse action only after the employee engages in protected conduct, a reasonable jury may infer that the adverse action is based on the protected conduct. See Eliserio v. United Steelworkers of Am. Local 310, 398 F.3d 1071, 1079-80 (8th Cir. 2005). In Eliserio, the employer essentially ignored or minimized five complaints about an employee's misuse of internet and radio privileges before demoting the employee following a sixth complaint and intervening protected conduct. Id. Additionally, the employer had never disciplined an employee for internet or radio misuse in the preceding eight years. Id. Here, however, there is no such pattern. The evidence shows that Defendant treated financial loss and policy violations seriously, both in Plaintiff's case, and when caused by other employees. (See Def.'s Am. Interrog. Answers to Interrog. No. 6, Ex. 23 to Sharp Decl. [Doc. No. 25-2].) No discriminatory inference is warranted under these facts.

Essentially, Plaintiff argues that her positive employment history at U.S. Bank undercuts Defendant's proffered reason for termination. "[E]vidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and

discrimination. However, such circumstantial evidence can be relevant when considering whether the record as a whole establishes a genuine issue of material fact." Strate, 398 F.3d at 1020. In opposition to the instant motion for summary judgment, Antonich submitted her performance review from February 2012, the year before the check-cashing incident. (2012 U.S. Bank Performance Review, Ex. 5 to Sharp Decl. [Doc. No. 25-2].) The 1-5 rating scale is coded as follows: 1 indicates exceptional performance; 2 indicates highly effective performance; 3 indicates solid performance, 4 indicates that the employee needs improvement, and 5 indicates that the employee's performance is not effective. (Id. at USB00001.) On the 2012 review, Plaintiff received ratings of 3 for "solid performance" in all areas but one. (Id. at USB00001-05.) She received a "needs improvement" rating of 4 in the category of "Workplace Standards." (Id. at USB00003.) The form defines "Workplace Standards" as, "Working hours and breaks are observed as scheduled. Meets acceptable standards for work attendance. Follows department and company procedures and policies." (Id.) (emphasis added). A manager comment explains, "Management would like to see the amount of tardiness and sick time go down in 202, as this is a direct effect on her customers and fellow employees." (Id.)

While Plaintiff may have generally been a good or average employee, unlike cases such as Strate or Hase v. Mo. Div. of Emp't Sec., 972 F.2d 893, 897 (8th Cir. 1992), where evidence of a strong employment history was considered, Plaintiff here was not a decades-long employee, nor is there evidence of her superior performance as compared to other employees. Rather, her review from the previous year shows that she needed

improvement in the very area for which she was ultimately terminated – adherence to the bank's procedures and policies. (2012 U.S. Bank Performance Review at USB00003, Ex. 5 to Sharp Decl. [Doc. No. 25-2].) The Court finds that, based on the record as a whole, evidence of Plaintiff's past performance history at U.S. Bank does not create a genuine issue of fact for purposes of establishing pretext.

Similarly, Plaintiff argues that her favorable performance review in March 2013 demonstrates that U.S. Bank's proffered reason for termination was pretextual. (Pl.'s Opp'n Mem. at 16-17 [Doc. No. 24].) "[R]ecent favorable reviews are often used as evidence that the employer's proffered explanation for the adverse action had no basis in fact or was not actually important to the employer." Smith. 302 F.3d at 834. In Smith, the court rejected a positive review as evidence of pretext where the person conducting the review was unaware of certain performance deficiencies. Id. Here, Customer Service Manager Kujak, who was aware of the fraudulent check transaction at the time of Plaintiff's March 2013 review, gave Plaintiff a favorable review. (See Antonich Dep. at 121-23; 138-39, Ex. 1 to Schooler Decl. [Doc. No. 17-1].) However, Kujak was not a U.S. Bank employee responsible for reviewing and evaluating losses, determining whether procedural violations occurred, and recommending disciplinary action. Rather, District Performance Analyst Adkins was responsible for rendering that analysis. (Adkins Decl. ¶ 3 [Doc. No. 18].) It was Adkins who considered whether a policy violation had occurred. (Id.) Thus, while Kujak was aware of the fraudulent check, there is no evidence showing that she was aware of the details of the investigation, which, in

turn, might have been reflected in Plaintiff's review.  As in <u>Smith</u>, the Court finds that evidence of Plaintiff's positive review does not create a fact issue regarding pretext.

### c. Comments

Plaintiff identifies the following comments as evidence of pretext: (1) Thompson's comments to Antonich regarding her parenting leave; and (2) Thompson and Hobrough's reference to her protected status.  (Pl.'s Opp'n Mem. at 17-20; 24-25 [Doc. No. 24].)

The Court finds that Thompson's benign questions and comments about Plaintiff's leave fail to demonstrate pretext.  As noted earlier, an employee's attempt to establish pretext requires more substantial evidence than required for establishing a prima face case, because evidence of pretext is viewed in light of the employer's justification. <u>Smith</u>, 302 F.3d at 834.  Thompson commented to Antonich that he wished he had taken a longer parenting leave when his children were born – which actually suggests that he was supportive of employees taking parenting leave – and he otherwise simply asked about the timing of Plaintiff's impending leave and childcare arrangements.  (Antonich Dep. at 140-41, Ex. to Sharp Decl. [Doc. No. 25-1].)  Although Plaintiff may have considered Thompson's inquiries to be invasive and distracting, she did not object to his questions or comments.  (<u>Id.</u> at 143.)   Similarly, although Plaintiff found that Thompson adopted an "annoyed" tone when he conveyed that he wished that he had had a longer parenting leave, that merely suggests that he was annoyed that he did not take a longer leave.  His comments are simply not susceptible to interpretation as discriminatory and stand in contrast to remarks in other cases found to be evidence of discrimination.  <u>Cf.</u> <u>Roberts,</u>

528 F.3d at 1127-28 (finding genuine disputed issue of fact as to pretext based on manager's actions in sighing when plaintiff notified her of pregnancy and then commenting, "What are you going to do about the pregnancy; are you going to keep it?"); Walsh v. Nat'l Computer Sys., Inc., 332 F.3d 1150, 1160 (8th Cir. 2003) (affirming pregnancy discrimination verdict for plaintiff where employer made several pregnancy-related comments, including,"You better not be pregnant again!"and required more extensive documentation for plaintiff's medical appointments than for those of her non-pregnant colleagues.)

As to Thompson's conversation with Hobrough, in which he indicated that Plaintiff was pregnant in the course of a discussion about Plaintiff's policy violations and possible discipline, "mere reference to [an employee's] protected status does not reflect any intent to discriminate." Elam, 601 F.3d at 880. Plaintiff relies on Gipson v. Wells Fargo N.A., 460 F. Supp. 2d 15, 26-27 (D. D.C. 2006), for the proposition that where an employer reveals an awareness of a protected trait during a discussion such as this, it suggests that pregnancy was a factor in the decision to terminate Plaintiff. (Pl.'s Opp'n Mem. at 25 [Doc. No. 24].) In Gipson, the court found that an interviewer's "verbalized awareness" of an employee's discrimination complaint during her interview for a promotion, combined with temporal proximity of the two events, suggested possible retaliatory intent. 460 F.2d at 27. Here, however, there is simply insufficient evidence, viewing the facts as a whole, to support such an inference. Thompson testified that Plaintiff's pregnancy was irrelevant to the disciplinary decision and that he mentioned her

impending leave simply to make Hobrough, his manager, aware of all of the circumstances. (Thompson Dep. 26; 36-37, Ex. to Sharp Decl. [Doc. No. 25-1].) Hobrough also considered the information irrelevant to the corrective action decision and did not know why Thompson mentioned it. (Hobrough Dep. at 78-80, Ex. to Sharp Decl. [Doc. No. 25-1].) As Defendant observes, there is nothing discriminatory about an employer seeking to resolve a pending disciplinary issue before the employee takes a scheduled leave of absence. (Def.'s Reply Mem. at 12 [Doc. No. 27].) Viewing all of the facts in the record, the Court finds that the reference to Plaintiff's status in the course of this conversation does not create a fact question concerning pretext for discrimination.

Finally, to the extent that Antonich asserts that the "grumblings" of branch managers about short staffing during employees' parenting leaves could be construed as evidence of pretext, the Court disagrees. (Pl.'s Opp'n Mem. at 5 [Doc. No. 24].) Plaintiff testified that she heard a branch manager at a different location make a statement to this effect, but could not identify him by name. (Antonich Dep. at 148-49, Ex. to Sharp Decl. [Doc. No. 25-1].) This evidence is far too indefinite and remote to be considered evidence of pretext.

### d.  Statements Regarding the Decisionmaking Process

Plaintiff argues that allegedly conflicting statements from U.S. Bank deponents regarding the decisionmaking process, and the fact that certain witnesses could not recall having had conversations about Plaintiff, further demonstrates a question of fact as to pretext. (Pl.'s Opp'n Mem. at 20–24 [Doc. No. 24].) Specifically, Plaintiff contends that

by "attempting to avoid identifying Mr. Thompson as a decisionmaker or as part of the decisionmaking process" (id. at 20), this serves as evidence of pretext. Defendant, however, concedes that there is no dispute that Thompson participated in the termination decision by gathering facts, reporting them to Hobrough, and discussing the appropriate course of action with Hobrough. (Def.'s Reply Mem. at 14 [Doc. No. 27]) (citing Thompson Dep. at 26, Ex. to Sharp Decl. [Doc. No. 25-1].)

Whether Thompson was a decisionmaker or "the decisionmaker" in Plaintiff's termination is relevant only if his conduct or comments establish an inference of discriminatory bias or animus. Plaintiff asserts that regardless of Thompson's official decisionmaking label, his "motive" taints the decisionmaking process under a "cat's paw" theory of liability, citing, *inter alia*, Staub v. Proctor Hosp., 131 S. Ct. 1186, 1194 (2011) (imputing liability to a company where nondecisionmakers "took the actions that allegedly caused [the decisionmaker] to fire [the employee]."). As noted above, however, the Court finds that no reasonable factfinder could conclude that Thompson's remarks to Antonich and his conversation with Hobrough demonstrate unlawful bias or animus. Plaintiff's evidence does not rebut the factual basis underlying Defendant's proffered basis for terminating her, nor does it show that that proffered basis was not the true reason for her termination. See Fiero, 759 F.3d at 878.

Antonich also disputes Zetzman's statement that she spoke with Antonich as part of her investigation involving the fraudulent check, at which time Antonich admitted to not following procedures (Zetzman Decl. ¶ 3 [Doc. No. 19].) At her deposition,

Antonich testified that she spoke with no one in management at U.S. Bank about the fraudulent check from the time period immediately after the February incident until late May. (Antonich Dep. at 129, Ex. to Sharp Decl. [Doc. No. 25-1].) Zetzman attests that Antonich's admitted failure to follow procedure, coupled with the amount of loss, led her to recommend termination. (Zetzman Decl. ¶¶ 3-4 [Doc. No. 19].) To the extent that Zetzman remembers a phone call and Antonich did not testify about such a call, the discrepancy does not rise to the level of pretext. There is no dispute that Plaintiff admitted to the policy violations in her deposition. (Antonich Dep. at 124, Ex. 1 to Schooler Decl. [Doc. No. 17-1].) Further, termination was contemplated in Defendant's loss guidelines by virtue of the amount of loss alone, to say nothing of the added effect of multiple policy violations. (Guidelines for Managing Loss, Ex. 3 to Waldvogel Decl. [Doc. No. 21-1]).

Antonich also cites testimony of certain witnesses who could not recall the details of conversations relating to Plaintiff, suggesting that such conversations therefore failed to occur and that U.S. Bank is playing a game of "hot potato" regarding who made the termination decision. (Pl.'s Opp'n Mem. at 23 [Doc. No. 24].) Specifically, she asserts that Zetzman had no recollection of ever speaking with Christensen, Thompson, or Hobrough regarding Antonich's policy violations. (Id.) However, as U.S. Bank notes, Hobrough admitted to making the termination decision, Thompson testified that he participated in the decision, and Zetzman admitted to recommending that Plaintiff be terminated. (Thompson Dep. at 26, Ex. to Supp'l Sharp Decl. [Doc. No. 25-1]; Hobrough

Dep. at 20, Ex. 6 to Supp'l Schooler Decl. [Doc. No. 28-1]; Zetzman Dep. at 59, Ex. 2 to Supp'l Schooler Decl. [Doc. No. 28-1].)  There is no dispute that Hobrough, Thompson, and Zetzman were all involved in the termination decision, regardless of whether Hobrough ultimately made the decision.  (See Def.'s Reply Mem. at 15 [Doc. No. 27].)  Accordingly, this situation is unlike that in Johnson v. J.B. Hunt Transp., Inc., No. 12-cv-2031(MJD/TNL), 2013 WL 6731935, at *10 (D. Minn. Dec. 19, 2013), a case on which Plaintiff relies, in which the defendant offered no evidence of who made the termination decision, which, among other things, supported a finding of pretext.

Rather, the minor discrepancies regarding decisionmaking here do not undermine the fact that Defendant has consistently identified Hobrough, Thompson, and Zetzman as being involved in the decisionmaking process.  (See Def.'s Am. Interrog. Answers to Interrog. Nos. 2-3, Ex. 23 to Sharp Decl. [Doc. No. 25-2]) (identifying Christensen, Thompson, Hobrough, and Zetzman as being involved in the termination decision, and Adkins as being involved in the investigation).  But most importantly, Defendant has always provided a consistent, legitimate reason for terminating Plaintiff – her violation of multiple bank policies, resulting in a $2,470 loss.  See Wierman, 638 F.3d at 995-96 (finding that minor discrepancies in employer's documents regarding employee's violations did not undermine employer's consistent, legitimate reason for terminating employee, and therefore failed to raise a triable issue as to pretext).

In a related vein, Plaintiff also argues that U.S. Bank made false statements about the impact of her pregnancy on the timing of her termination, which constitutes evidence

of pretext.  (Pl.'s Opp'n Mem. at 25 [Doc. No. 24].)  HR Business Partner Waldvogel's response to Plaintiff's ethics complaint indicates that the timing of Plaintiff's impending leave required that any corrective action be "escalated to a HR Manager, delaying the time to make a decision."  (Ethics Response Form, Ex. 6 to Waldvogel Decl. [Doc. No. 21-1].)  Both Thompson and Hobrough, however, testified that the fact of Plaintiff's pregnancy did not impact the timing of her termination.  (Hobrough Dep. at 80-81, Ex. to Sharp Decl. [Doc. No. 25-1]; Thompson Dep. at 99-100, Ex. to Sharp Decl. [Doc. No. 25-1].)  Thompson and Hobrough may not have been aware of any delay resulting from consultation with HR at the time the termination decision was made, while Adkins may have subsequently gathered this information in the course of investigating Plaintiff's ethics complaint, post-termination.  Such a factual discrepancy is minor and does not suggest that Defendant's reason for terminating Plaintiff was unworthy of credence or that it conceals a true, discriminatory motive.

For all of these reasons, the Court therefore finds that any factual discrepancies do not serve as evidence of pretext.

### e.     Different Treatment

As other evidence of pretext, Plaintiff argues that U.S. Bank treated her differently than other non-pregnant employees.  (Pl.'s Opp'n Mem. at 26-31 [Doc. No. 24].)  An employee bears the burden "to prove that the compared employees were similarly situated in all relevant respects."  Smith, 302 F.3d at 835.  "At the pretext stage, the test for whether someone is similarly situated, as to be of use for comparison, is rigorous."

Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (8th Cir. 2014) (discussing test in context of age discrimination claim). Similarly situated employees, or "comparators," must have "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Hervey v. Cnty. of Koochiching, 527 F.3d 711, 719 (8th Cir. 2008). Moreover, "to be probative of pretext, the alleged misconduct of other employees must be of 'comparable seriousness.'" Elam, 601 F.3d at 881 (citation omitted).

Here, Plaintiff asked U.S. Bank to identify, for the relevant time period, "any employee . . . who worked within Plaintiff's region and who Defendant claims "cashed a fraudulent check," or violated Defendant's policies in any similar fashion . . . and whether the employee was disciplined and the nature and substance of any discipline." (See Def.'s Am. Interrog. Answers to Interrog. No. 6, Ex. 23 to Sharp Decl. [Doc. No. 25-2]) (emphasis added). Defendant responded to the interrogatory request, providing a list of employees in a chart form. (Id.) Of the employees whom U.S. Bank identified, Plaintiff points to nine employees who, she contends, were not terminated when they were responsible for losses of $1,000 or more. (Pl.'s Opp'n Mem. at 27-28 [Doc. No. 24]; see also EEOC Questionnaire. at MA000206 [Doc. No. 25-2].) Antonich also identified two additional employees.[3] (See Pl's Opp'n Mem. at 9 [Doc. No. 24].) However, U.S. Bank

_____

[3] The employees in question are: Marki Turner, Suzanne Devlin, Christine Kostroski, Alissa Backsen, Kara Gregory, Evelyn Ramos, Janet Laduke, Andre Day-Horner, Brandon Stein, Michael Christensen, and LouAnn Swift. (Id.) Of that group, the two employees whom Plaintiff identified are Christensen and Swift. (Pl.'s Opp'n

contends that the proper comparison is between Twin Cities employees who violated bank policy <u>and</u> the violation resulted in a loss in excess of $2,000. When the comparators are identified using those two factors, U.S. Bank attests that it is unaware of a policy violation by a Twin Cities teller that resulted in a loss in excess of $2,000 that did not result in either termination or resignation prior to termination. (Zetzman Decl. ¶ 4 [Doc. No. 19].)

The Court finds that relevant comparator employees are tellers in the Twin Cities who remained employed by U.S. Bank (i.e., were not terminated or did not resign or abandon their position prior to termination) after violating a U.S. Bank policy, resulting in a loss in excess of $1,000 – which is the amount listed in the bank's Guidelines for Managing Losses. Using this as the relevant standard for comparators, there are no employees who are identified as having committed policy violations resulting in a loss of $1,000 or more, who remained employed at U.S. Bank. (<u>See</u> Def.'s Am. Interrog. Answers to Interrog. No. 6, Ex. 23 to Sharp Decl. [Doc. No. 25-2].) Granted, there are employees who generated a loss of over $1,000, but for whom the cause of the loss is identified as "teller variation," as opposed to a policy violation. (<u>Id.</u>) Defendant did, in fact, indicate incidents in which policy violations occurred, for applicable employees. (<u>Id.</u>) There are also employees who, due to "teller variation," generated a "risk of loss"

---

Mem. at 26-27 [Doc. No. 24].) The other nine employees were identified by Defendant in response to Plaintiff's interrogatories. (Def.'s Am. Interrog. Answers to Interrog. No. 6, Ex. 23 to Sharp Decl. [Doc. No. 25-2])

higher than $1,000, but because no actual loss was apparently incurred, those employees remained employed. (Id.) Plaintiff, however, chose to frame her interrogatories using the disjunctive "or," asking for employees who either cashed a fraudulent check or violated bank policy in a similar fashion. (See Def.'s Am. Interrog. Answers to Interrog. No. 6, Ex. 23 to Sharp Decl. [Doc. No. 25-2].)

Moreover, Plaintiff's interrogatory was not limited to tellers, and therefore, could also include managers in the field of purported comparators. In fact, Plaintiff identifies Branch Manager Christensen as a similarly situated employee, who informed Plaintiff that he was responsible for an even higher loss amount during his tenure at U.S. Bank, yet he remained employed with the bank. (Pl.'s Opp'n Mem. at 26-27 [Doc. No. 24].) This Court has found that managers and staff workers are not similarly situated. Freeman v. Ace Tel. Ass'n, 404 F. Supp. 2d 1127, 1137 (D. Minn. 2005). In addition, as a factual matter, because U.S. Bank branch managers assume higher dollar-amount risk in the performance of their job duties than tellers, U.S. Bank does not apply the same standards to branch managers as it does to tellers. (Waldvogel Decl. ¶ 15 [Doc. No. 21].) Moreover, because Christensen was a manager, he and Plaintiff did not report to the same supervisors. As to Christensen, however, there is no competent evidence in the record before the Court regarding his position with the bank at the time of the loss. He cannot be considered a similarly situated employee.

Plaintiff also compares herself to several U.S. Bank employees who caused lower level losses and did not violate the bank's policies. She identifies seven employees who

caused losses of $1,000 due to "teller variations" (Pl.'s Opp'n Mem. at 18 [Doc. No. 27]),

which Defendant defines as inadvertent mistakes such as miscounting.  (Def.'s Reply

Mem. at 18 [Doc. No. 27].)  These employees, however, did not cause a loss two-and-a-

half times greater by violating company policies.  They cannot therefore be considered

similarly situated employees because they did not participate in the "same conduct

without any mitigating or distinguishing circumstances" and their losses were not of

"comparable seriousness."  See Elam, 601 F.3d at 881.

Regarding specific employees besides Christensen, Plaintiff's basis for naming

LouAnn Swift as a comparator is based on inadmissible hearsay, as Plaintiff cites a

document that she authored herself and submitted to the EEOC.  (EEOC Questionnaire at

MA00206, Ex. 3 to Sharp Decl. [Doc. No. 25-2 at MA00206].)  Nothing in the record

demonstrates that Plaintiff has personal knowledge of the underlying facts, as required by

Fed. R. Evid. 602.   Moreover, nothing in the record shows that Swift violated any U.S.

Bank policies or that a loss resulted from Swift's conduct.  She cannot be considered a

similarly situated employee.

Another employee, Suzanne Devlin, who Plaintiff identifies as similarly situated,

was terminated, just as Plaintiff was, for causing a far lower loss of $1,275.44.[4]  (See

_____

[4] As Defendant notes in its Reply Memorandum [Doc. No. 27 at 18, n.6], it
inadvertently listed Devlin twice in its response to Plaintiff's Interrogatory Number 6.
(Def.'s Am. Interrog. Answers to Interrog. No. 6, Ex. 23 to Sharp Decl. [Doc. No. 25-2].)
In one entry, it mistakenly noted that Devlin was still employed, while in another it
correctly noted that Devlin was terminated.  (Id.)

Def.'s Am. Interrog. Answers to Interrog. No. 6, Ex. 23 to Sharp Decl. [Doc. No. 25-2].) Thus, Plaintiff was not treated differently than Devlin, nor was the loss of "comparable seriousness." Moreover, Defendant indicates that the cause of Devlin's loss was "teller variation," as opposed to a policy violation. (Id.) She is not a similarly situated employee.

Regarding another employee, Marki Turner, Defendant's interrogatory responses indicate that Turner abandoned his job before the bank could take disciplinary action. (Id.) Since Turner quit before a termination decision could be made, his circumstances are not comparable to Plaintiff's. Moreover, the cause of the loss in his case was "teller variation," not a policy violation. (Id.)

Finally, Antonich argues that other tellers cashed approximately $10,000 in fraudulent checks on the same day that she cashed the fraudulent check and were apparently not terminated. (Pl.'s Opp'n Mem. at 28 [Doc. No. 24].) However, the evidence demonstrates otherwise. District Performance Analyst Adkins attests that while twelve fraudulent checks were transacted on the day in question, February 23, 2013, the check cashed by Plaintiff was the only fraudulent check that was cashed by a teller at U.S. Bank. (Supp'l Adkins Aff. ¶¶ 3-4, Ex. 1 [Doc. No. 29]; Email of 12/4/13 from M. Adkins to E. Waldvogel, Ex. 1 to Supp'l Adkins Aff. [Doc. No. 29-1].)

In sum, the Court finds that Plaintiff has failed to establish the existence of similarly situated comparator employees to create a question of fact as to pretext.

####   f.      Consistency of Termination with Policy and Practice

Plaintiff also argues that U.S. Bank's termination of Plaintiff was inconsistent with both its policies and practices.  (Pl.'s Opp'n Mem. at 32 [Doc. No. 24].)  An employer's violation of its own policies may be indicative of pretext.  Dixon v. Pulaski Cnty. Special Sch. Dist., 578 F.3d 871-72 (8th Cir. 2009), abrogated on other grounds by Torgerson, 643 F.3d at 1058.  Here, Plaintiff cites to testimony standing for the proposition that U.S. Bank does not typically delay the termination of employees three months after the occurrence of a policy violation (Pl.'s Opp'n Mem. at 32 [Doc. No. 24]) (citing Zetzman Dep. at 66, Ex. to Sharp Decl. [Doc. No. 25-1]), and to Hobrough's testimony that she does not typically discuss the fact of an employee's pregnancy when making disciplinary decisions.  (Id.) (citing Hobrough Dep. at 78, Ex. to Sharp Decl. [Doc. No. 25-1].)  Again, U.S. Bank has clearly explained the circumstances surrounding the three-month period of time between Plaintiff's processing of the fraudulent check and her resulting termination.  The fact that the investigation and termination took longer in this case merely makes it unusual – it does not make it discriminatory.  Likewise, the fact of Plaintiff's impending leave in the context of the conversation between Thompson and Hobrough was simply noted – it did not reveal animus or discriminatory intent, nor demonstrate a deviation from company policy.

Finally, as to Plaintiff's claim that Defendant discriminated against her by failing to re-hire her, there is no evidence of any such discrimination, or that U.S. Bank failed to follow its own procedures with respect to re-hiring.  The evidence shows that U.S. Bank

typically does not re-hire former employees for money-handling positions, such as teller positions, if they caused financial losses by violating company policy in their previous employment with U.S. Bank.  (Waldvogel Decl. ¶ 13 [Doc. No. 21].)  Plaintiff testified that Defendant told her this as well.  (Antonich Dep. at 179, Ex. to Sharp Decl. [Doc. No. 25-1].)  Moreover, at U.S. Bank, a previous policy violation resulting in a monetary loss makes it more difficult for an applicant to be re-hired for any U.S. Bank position. (Waldvogel Decl. ¶ 13 [Doc. No. 21].)

### g.    Lack of Documentation

Finally, Antonich argues that the fact that U.S. Bank failed to retain documentation regarding her termination is evidence of pretext.  (Pl.'s Opp'n Mem. at 34 [Doc. No. 24].) "An adverse inference from the destruction of evidence arises only when the destruction is intentional and indicates a desire to suppress the truth."  Johnson, 769 F.3d at 614. Plaintiff has submitted no evidence indicating that Defendant intentionally destroyed documents with a desire to suppress the truth.  At the hearing on the instant motion, Defendant's counsel stated that U.S. Bank has a 90-day document destruction policy. Defendant was under no obligation at the time of the events in question, or prior to litigation, to maintain any records beyond that time period, to the extent they existed.  The Court finds that Defendant's lack of contemporaneous documentation does not create an issue of fact as to pretext.

Accordingly, for all of the foregoing reasons, the Court finds that no material issues of fact remain in dispute and that Defendant is entitled to summary judgment.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Defendant's Motion for Summary Judgment [Doc. No. 14] is **GRANTED**;

      and

2.    Plaintiff's First Amended Complaint [Doc. No. 1-1] is **DISMISSED WITH**

      **PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   August 13, 2015

                                    s/Susan Richard Nelson
                                    SUSAN RICHARD NELSON
                                    United States District Court Judge